**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DEBORAH MCKINZIE,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀No. 23 C 05036
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Judge Sara L. Ellis
CONDUENT H.R. SERVICES, LLC,⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀⠀)

**OPINION AND ORDER**

Plaintiff Deborah McKinzie worked as a benefit administration analyst at Conduent H.R. Services, LLC ("Conduent") from December 2015 through April 2023. After Conduent terminated her position, she brought this lawsuit alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* She also brings claims for unpaid overtime pay in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105/1 *et seq.*, alleging that Conduent misclassified her as exempt from overtime pay under both statutes. Conduent has now moved for summary judgment. Because McKinzie has failed to establish an issue of material fact as to any of her claims, the Court grants summary judgment for Conduent.

**BACKGROUND**

**I.⠀⠀⠀⠀McKinzie's Statement of Additional Facts**

Before reciting the facts relevant to resolution of the motions for summary judgment, the Court must address McKinzie's Statement of Facts ("PSOF"). The Court's summary judgment procedures differ from Local Rule 56.1, in that this Court requires parties to submit a joint

statement of undisputed facts.  Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice; *see also Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures).  The party opposing summary judgment may, however, submit additional facts it contends demonstrate a genuine issue of material fact in its response, providing citations to supporting material.  Judge Ellis, Summary Judgment Practice.  These additional facts must be genuinely disputed; the non-moving party may not use the response as an opportunity to sidestep the joint process.  *See id.* ("The parties may not file—and the Court will not consider—separate statements of undisputed facts.").

Here, the parties submitted a joint statement of undisputed material facts ("SUF") on August 29, 2025.  Doc. 97.  On October 6, 2025, however, McKinzie filed her own statement of facts ("PSOF").  Conduent argues that the Court should strike the entirety of the PSOF because McKinzie failed to comply with this Court's summary judgment procedures.  After carefully and extensively reviewing the entirety of the PSOF and the parties' briefing, this Court will disregard portions of the PSOF that make legal arguments, assert legal conclusions, or do not include any factual statements.  *See Fetzer v. Wal-Mart Stores, Inc.*, No. 13 C 9312, 2016 WL 792296, at *8 (N.D. Ill. Mar. 1, 2016) ("[L]egal arguments in Rule 56.1 submissions are improper so the court will disregard legal arguments and conclusions in the plaintiff's Rule 56.1 submissions.").  The Court will also disregard the portions of the PSOF that restate facts already contained in the SUF or recite facts that are not supported with citations to admissible evidence.  *See Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) ("Where a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").  The Court, however, will not strike the entirety of the noncompliant

paragraphs as, in rare cases, they contain properly supported and disputed assertions. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (disregarding portions of noncompliant paragraphs in order to preserve the properly supported assertions in the paragraphs).

That being said, this Court sternly admonishes McKinzie for filing her PSOF without regard to the Court's summary judgment procedures. Her filing subverts the purposes of this Court's summary judgment procedures and the Court warns McKinzie that future instances of noncompliance with the Court's procedures will result in sanctions.

## II. Factual Background[1]

McKinzie worked as a full-time, remote benefit administration analyst at Conduent from December 2015 through April 2023. In this position, McKinzie was responsible for providing services to Conduent's client, Delta Airlines ("Delta"), regarding Delta's defined benefit and defined contribution plans. McKinzie was the "point person" for Delta benefits projects, and she considered herself to be a "subject matter expert for defined benefits for qualified domestic relations orders and for 401(k)s." Doc. 97 at D59. McKinzie's responsibilities included managing Delta's qualified domestic relations orders, including by calculating benefits, setting up payments, and managing the 401(k) payroll process. To the extent that issues or questions arose with qualified domestic relations orders or 401(k)s for Delta, McKinzie was responsible for determining and implementing a resolution. McKinzie also dealt directly with Delta personnel in biweekly meetings and answered questions from Delta employees and representatives. Further, McKinzie trained and reviewed the work of the offshore employees assigned to work on the Delta account.

---

[1] The Court derives the facts set forth in this section from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1 and the Court's summary judgment procedures. The Court considers all facts in the light most favorable to McKinzie, the non-movant.

Beginning in December 2022, McKinzie's manager, Melissa O'Malley, imposed a requirement that McKinzie secure written confirmation that her co-workers would be available to provide coverage during times when she was absent. In January 2023, McKinzie requested time off for a trip to Las Vegas to celebrate her mother's birthday. She secured coverage verbally, rather than by email. This resulted in an interaction with O'Malley that "left [McKinzie] in tears." *Id.* at P11. O'Malley and McKinzie then had a call, and McKinzie told O'Malley, "I don't like the way you spoke to me." *Id.* McKinzie testified that O'Malley then "blew up on [her] even worse" and "went for the jugular." *Id.*

McKinzie's performance review ratings between 2017 and 2021 ranged from "meets standards" to "frequently exceeds expectations." Doc. 97-2 at 34–71. However, in December 2022, Conduent instructed O'Malley to prepare a stack ranking of her direct and indirect reports. O'Malley ranked McKinzie within the "bottom 10%" of the members of her organization. Doc. 97 at D11. That same month, O'Malley selected McKinzie as a possible reduction-in-force ("RIF") candidate based on negative feedback she received regarding McKinzie's performance. Specifically, other employees criticized McKinzie for failing to provide her work counts in October and for seeking assistance from offshore personnel. These employees also expressed concerns as to whether McKinzie could handle a full workload. At the time of this selection, O'Malley did not know if Conduent would need to implement the RIF.

O'Mally continued identifying issues regarding McKinzie's performance after December 2022. In early March 2023, for example, O'Malley asked Conduent's client services manager for the Delta account to have one of his subordinates rate McKinzie and Steven Penney, the two benefits administration analysts who reported to her at the time. On March 14, 2023, Hankins sent to O'Malley the following ratings:

4

| | Skills | Deborah McKinzie / 20685113 | Comparable 1 Steven Penney / 40862850 |
|---|---|---|---|
| 1 | Communicates clearly, with respect, honesty, & transparency. | 1 | 3 |
| 2 | Ownership of work. | 1 | 3 |
| 3 | Learns from mistakes. | 1 | 3 |
| 4 | Asks for and offers to help others. | 1 | 4 |
| 5 | Aims for getting things right the first time; fixes things if they do not get right the first time. | 1 | 3 |
| 6 | Teamwork - works well with others. | 2 | 4 |
| 7 | Client facing contact / client relationship. | 2 | n/a |
| 8 | Review and reconciliation skills. | 2 | 3 |
| 9 | QDRO calculations. | n/a | 3 |
| 10 | Special projects. | n/a | 4 |
| | **Total** | **11** | **30** |

Rating 1 - 4
0 = None
1 = Basic Knowledge
2 = Intermediate
3 = Advanced
4 = Expert

*Id.* at D46.  Around the same time, O'Malley also solicited rankings for two offshore Conduent employees assigned to the Delta account.  Using the same rubric as McKinzie and Penney, those employees received total scores of 29 and 33.

Also in early March 2023, McKinzie first mentioned to O'Malley that she would need time off for medical appointments.[2]  O'Malley did not provide any feedback or response during this conversation.  Shortly thereafter, on March 16, 2023, McKinzie submitted a request for intermittent FMLA leave to Conduent's third-party administrator, MetLife.  McKinzie's healthcare provider completed her FMLA certification on March 29, 2023, and MetLife approved the request.  When O'Malley learned of this, she told McKinzie, "We discussed that," in reference to McKinzie's need for time off to attend medical appointments.  *Id.* at P21.  O'Malley further told McKinzie that she did not believe a FMLA request was necessary.  McKinzie responded that she "wanted to do everything according to the book, that she wanted to follow the rules and have things in black and white, and not rely on what is said in a phone call." *Id.*

Conduent ultimately proceeded with the RIF and first started notifying affected employees on March 17, 2023.  On April 7, 2023, Conduent notified McKinzie that it was

---

[2] McKinzie has multiple health conditions that require continued medical treatment, including cardiomyopathy, glaucoma, hypertension, plantar fasciitis, and cellulitis.

5

eliminating her position as part of a RIF and would pay her through April 21, 2023. McKinzie was 58 years old at the time of her termination. Conduent also terminated four other employees as part of this RIF, ages 45, 55, 61, and 67 years old. Prior to the terminations, a human resources analyst reviewed the candidate selections "to ensure that the selection [was] not based upon any discriminatory motives." *Id.* at D79. The analyst, Walter Valdes, identified proper comparators for each of the five RIF candidates by looking at employees "who held the same position and who were in the same cost center and managerial line" as the RIF candidates. *Id.* at D83. This review confirmed, among other things, that the only other employee who held the same position as McKinzie and who reported to O'Malley was 65 years old. Three other employees held McKinzie's position, but reported to different managers, and these employees were 59, 61, and 63 years old. McKinzie was the youngest employee in this group and the only one terminated in the RIF.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above

6

to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

## I.      ADEA Claim

Conduent first moves for summary judgment on McKinzie's age discrimination claim, arguing that McKinzie has failed to create a genuine issue of material fact that Conduent terminated her because of her age. The ADEA prohibits employers from discharging or discriminating against an individual who is 40 years or older because of that individual's age. 29 U.S.C. §§ 623(a)(1). To prevail on an age discrimination claim, McKinzie "must prove that [her] age was the 'but-for' cause of the challenged job action." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). "In other words, under the ADEA 'it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for [her] age, the adverse action would not have occurred.'" *Id.* (citing *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009)).

A plaintiff can prove age discrimination in various ways, including by presenting direct or circumstantial evidence that the defendant took the challenged job action against her because

of her age. *See Wrolstad*, 911 F.3d at 454. Alternatively, a plaintiff "may proceed through the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Carson v. Lake Cnty.*, 865 F.3d 526, 533 (7th Cir. 2017). Under this approach, a plaintiff must first establish a *prima facie* case of age discrimination by showing that: (1) she was over 40 years old, (2) her job performance met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other similarly situated individuals, who were not members of the protected class, received more favorable treatment. *Id.* (citation omitted). Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse actions, which the plaintiff may then attack as pretext. *McDonnell Douglas*, 411 U.S. at 802. Regardless of which of these two approaches a plaintiff adopts, however, the key inquiry at the summary judgment stage is whether the evidence would permit a reasonable factfinder to conclude that age caused the adverse employment action. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).

### A.      *Prima Facie* Case

Here, McKinzie does not present any direct or circumstantial evidence of age discrimination and instead attempts to establish a *prima facie* case. The Court agrees with Conduent that McKinzie has failed to show that younger, similarly situated employees received more favorable treatment. A similarly situated employee is generally "comparable to plaintiff in all *material* respects," meaning that they dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances. *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008). In a RIF

8

case like this one, the "dispositive issue" is "whether [similarly situated] younger workers were favored, i.e., kept on the payroll, because of their age." *Martino*, 574 F.3d at 454.

In her response brief, McKinzie does not identify any similarly situated employees who received more favorable treatment. At best, her section of the SUF vaguely identifies "two to three individuals . . . in their childbearing years," "another team member . . . Donald Pearson, [who] appeared to be in his late 30s or early 40s," and "Jeanette Travis, 45," as employees whom Conduent retained in the RIF. Doc. 97 at P29, P33. This is insufficient because McKinzie includes no details that would allow a reasonable juror to conclude that these employees were similarly situated. *See Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (agreeing that plaintiff "failed to carry her burden with respect to the similarly situated prong" because she did not "provide the ages, work history, performance reviews, supervisors, or qualifications of the" retained employees); *Perez v. Colwell Sys., Div. of Deluxe Corp.*, 83 F. Supp. 2d 976, 983 (C.D. Ill. 1999) ("The qualification 'similarly situated' is an important element of the *prima facie* case. The mere fact that a younger employee is retained in a RIF while an older employee is discharged is not enough to create an inference of age discrimination." (citation omitted)).

Despite not affirmatively identifying younger, similarly situated employees retained during the RIF, McKinzie nonetheless argues that she has established this "similarly situated" element for two reasons. First, she focuses on the comparators identified by Conduent, arguing that this evidence "should not be relied [on] for proper comparators." Doc. 99 at 11. But even assuming *arguendo* that Conduent's comparator evidence is unreliable, as McKinzie claims, this has no bearing on whether McKinzie has established a *prima facie* case. The burden of

9

identifying similarly situated employees is on McKinzie, not on Conduent. *See Marnocha*, 986 F.3d at 719.

McKinzie next argues that she has satisfied the similarly situated requirement because she was "subject to policies not applicable to other employees." *Id*. Specifically, she argues that O'Malley required her to obtain "written confirmation that backups [were] available to provide coverage during her absence." *Id.* at 12. There are multiple problems with this argument, however. Initially, McKinzie provides no evidence that younger, similarly situated employees were not subject to the same policy. But even if this policy was specific to McKinzie, it is entirely unclear how this would relate to a claim of age discrimination. O'Malley testified that it was important for McKinzie "to get her backups to confirm in email that they can cover for her, because if they can't do it, we have to find other resources." Doc. 97-1 at 216. Given that Conduent expected McKinzie to be generally available from 8:00 a.m. to 5:00 p.m. to answer client questions, Doc. 97 at P88, it is entirely logical that they would also require her to ensure coverage when she was unavailable. McKinzie does not argue that the reasons for this policy were pretextual, nor does she present evidence that this policy had anything to do with her age. She also does not claim that the supposedly uneven application of this policy resulted in younger, similarly situated employees receiving more favorable treatment during the RIF process. McKinzie cannot establish a *prima facie* age discrimination claim based solely on the fact that her job was subject to unique leave requirements; she must show that she was subject to an adverse employment action because of her age. *See Ortiz*, 834 F.3d at 764.

**B.      Legitimate, Non-Discriminatory Reasons**

Even if McKinzie had established a *prima facie* case of age discrimination, Conduent has met its burden of presenting evidence of a legitimate, non-discriminatory reason for her

termination. It is an undisputed fact that Conduent terminated McKinzie as part of a RIF and that "O'Malley selected McKinzie for the reduction-in-force based upon feedback she received regarding McKinzie's performance, including feedback that McKinzie 'moved work offshore.'" Doc. 97 at D12; *see also* Doc. 97-1 at 227 (O'Malley testifying that "the selection was based on that [McKinzie] had already transferred a certain amount of her work offshore"). This feedback influenced the selection because, according to O'Malley, "when you make a RIF selection, it is easier to transition work . . . when an employee doesn't really have a full scope of work." Doc. 97-1 at 227. O'Malley also based McKinzie's selection on feedback that "McKinzie did not provide her work counts in October" and "concerns as to whether [McKinzie] could handle a full scope of work." Doc. 97 at D12. This is sufficient, because "[a] RIF is a legitimate, non-discriminatory reason satisfying the second phase of the burden-shifting test." *Owens v. Porter Hosp., LLC*, No. 2:16 CV 372, 2019 WL 1429317, at *5 (N.D. Ind. Mar. 29, 2019) (citation omitted); *see also Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) ("[Defendant] gave legitimate non-discriminatory reasons for its actions, namely that [plaintiff's] position was eliminated as part of a company restructuring."); *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) ("[Defendant] has met its burden of producing admissible evidence of a legitimate, nondiscriminatory reason for firing [plaintiff]—that his poor performance made him expendable when the RIF took place.").

### C. Pretext for Discrimination

Finally, McKinzie has not provided any evidence that this "RIF was merely a pretext for discrimination," as is necessary to survive summary judgment. *Adams v. Alverno Clinical Lab'ys, Inc.*, 121 F. App'x 151, 153 (7th Cir. 2005). While McKinzie argues that certain evidence "negates the assertion that [she] was truly having performance issues," Doc. 99 at 9,

this falls flat for multiple reasons. First, Conduent terminated McKinzie as part of a RIF; it did not terminate her solely for performance-based reasons. The Seventh Circuit has explained that "[i]n a RIF, it is not pretextual to terminate an individual perceived to be a weak performer in an organization even if that individual's performance could also be characterized as satisfactory or adequate." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006); *see also* Doc. 97-1 at 226 (O'Malley testifying that "[s]ometimes people are really good employees and they have to be RIF'd"). It is entirely plausible that O'Malley selected McKinzie for the RIF because her performance was weak compared to other employees, even if she was generally meeting performance expectations.

Moreover, the evidence presented by McKinzie does not make it "clear that [she] was meeting performance expectations" at the time of the RIF, as she claims. While McKinzie previously received positive performance reviews, this does not negate the later criticisms of her performance or establish that the critical feedback collected for the RIF was pretextual. McKinzie's performance review ratings between 2017 and 2021 ranged from "meets standards" to "frequently exceeds expectations," Doc. 97-2 at 34–71, but "an employee's past performance is not indicative of present performance," *Gagen v. Cont'l Cas. Co.*, No. 05 C 1547, 2007 WL 57576, at *5 (N.D. Ill. Jan. 3, 2007) ("Gagen's arguments on the RIF process do not create a triable issue of fact on the issue of pretext. Although he points to his positive past reviews, Gagen does not offer any evidence that Demian or anyone at CNA intentionally discriminated against him based on his age."). Indeed, in 2022, McKinzie's performance review ratings dropped to "meet[s] some but not all expectations" and "does not meet expectations." Doc. 97-2 at 73–74. McKinzie presents no evidence that this 2022 performance review was pretextual; rather, she simply pretends that this negative feedback did not exist. *See* Doc. 99 at 10

12

(describing all performance reviews as "positive"). If anything, this 2022 performance review only bolsters Conduent's argument that it had legitimate, non-discriminatory reasons for McKinzie's termination.

For these reasons, the Court grants summary judgment for Conduent on the age discrimination claim.

## II.     FMLA Claims

Conduent also moves for summary judgment on McKinzie's FMLA claims. The FMLA "entitles any eligible employee suffering from a serious health condition that renders him unable to perform the functions of his position to twelve workweeks of leave during each twelve-month period." *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (citing 29 U.S.C. § 2612(a)(D)). The FMLA makes it unlawful for an employer to interfere with an employee's attempt to exercise her FMLA rights or retaliate against an employee for exercising her FMLA rights. 29 U.S.C. §§ 2615(a)–(b). McKinzie brings claims for interference and retaliation under the FMLA, which the Court addresses in turn.

### A.     FMLA Interference

McKinzie's first FMLA claim is based on the theory that Conduent interfered with her attempt to exercise her FMLA rights. To prevail on an FMLA interference claim, a plaintiff must establish that: (1) she was eligible for FMLA protection, (2) the FMLA covers her employer, (3) she was entitled to FMLA leave, (4) she provided sufficient notice of her intent to take FMLA leave, and (5) her employer denied her FMLA benefits to which she was entitled. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015). Conduent challenges only the last element, arguing that McKinzie has failed to create an issue of material fact as to whether it denied her FMLA benefits.

13

As a preliminary issue, the Court does not agree with Conduent that McKinzie's claim for FMLA interference "is actually one for retaliation instead." Doc. 96 at 9. McKinzie argues that Conduent interfered with her FMLA benefits in two distinct ways. First, she asserts that O'Malley attempted to discourage her from proceeding with her FMLA request. Next, she asserts that Conduent terminated her employment before she could take her approved FMLA leave. The Seventh Circuit has confirmed that interference is "not limited simply to the denial of leave," but also encompasses "'using the taking of FMLA leave as a negative factor in employment actions' and 'discouraging an employee from using such leave.'" *Preddie*, 799 F.3d at 818 (brackets omitted) (citations omitted). This holding encompasses both of McKinzie's interference theories, so the Court proceeds to analyze whether McKinzie has presented sufficient evidence to create triable issues of material fact.

Starting with McKinzie's first theory, she alleges that O'Malley discouraged her from exercising her FMLA rights by stating that they had already "discussed" McKinzie taking time off for medical appointments and "impl[ying] that FMLA leave was not necessary for McKinzie." Doc. 99 at 2–3. For interference claims based on an employer's discouragement, "the critical question is whether the employer's actions would discourage a reasonable employee from taking FMLA leave." *Preddie*, 799 F.3d at 818 n.35 (citing *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009)). Additionally, the plaintiff must establish prejudice, meaning that the discouragement "affected [her] decisions about FMLA leave." *Ziccarelli v. Dart*, 35 F.4th 1079, 1086, 1090 (7th Cir. 2022); *see also Curtis v. Costco Wholesale Corp.*, No. 13 C 3432, 2014 WL 4783051, at *8 (N.D. Ill. Sept. 24, 2014) ("[Plaintiff] must do more than point to some theoretical discouragement by Defendants. [Plaintiff] has not shown that he was prevented from exercising his rights. Nor has he indicated any other FMLA rights he would have exercised if he

14

had not felt discouraged."), *aff'd,* 807 F.3d 215 (7th Cir. 2015). Here, the Court is doubtful that O'Malley's comments would discourage a reasonable employee from taking FMLA leave. But even assuming that a jury could find that O'Malley's comments would discourage a reasonable employee, McKinzie does not present any evidence that these statements had any effect on her decisions about FMLA leave. To the contrary, she responded to O'Malley's comments by reiterating that she "wanted to do everything according to the book." Doc. 97 at P21. And she further admits in her response brief that O'Malley "attempted interference *and failed in her efforts.*" Doc. 99 at 3 (emphasis added). Because a reasonable jury could not find that O'Malley's discouragement prejudiced McKinzie, this first theory fails.[3]

McKinzie's second theory is based on allegations that Conduent interfered with her attempt to exercise her FMLA rights by terminating her employment shortly after approving her FMLA request. "A claim under the FMLA for wrongful termination can be brought under . . . [an] interference/entitlement theory." *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). That said, "an employer that would have taken action against an employee regardless [of] whether she took FMLA leave is not guilty of FMLA interference." *McLaren v. Wheaton Coll.*, 194 F. Supp. 3d 743, 756 (N.D. Ill. 2016). "[A]n employer is entitled to dismiss an employee for any lawful reason at any time, whether before, during, or after an employee requests or takes leave pursuant to the FMLA, as long as the employer does not discriminate or retaliate against the employee for requesting or taking such leave." *Serio v. Jojo's Bakery Rest.*, 102 F. Supp. 2d 1044, 1051 (S.D. Ind. 2000) (citations omitted). The key issue, therefore, is whether Conduent would have terminated McKinzie regardless of her FMLA request.

---

[3] The Court notes that McKinzie briefly testified about "the way [she] felt" after this conversation with O'Malley. Doc. 97-1 at 118. This vague testimony, however, is not sufficient to establish prejudice. *See Mezu-Ndubuisi v. Bd. of Regents*, No. 24-CV-31, 2025 WL 3187575, at *9 (W.D. Wis. Nov. 14, 2025) ("[Plaintiff's] bare statement that the one-day delay caused her 'anxiety' and 'concern' . . . does not show prejudice on her FMLA interference claim.").

Conduent has presented clear evidence that it would have terminated McKinzie regardless of her FMLA request. Most notably, O'Malley testified that she selected McKinzie for termination in the RIF on or around December 15, 2022, Doc. 97-1 at 194, months before McKinzie applied for FMLA leave or even mentioned her need to take time off for medical appointments, Doc. 97 at D21–D22. This timing undermines McKinzie's claim, because no reasonable jury could find that Conduent selected McKinzie based on events that had not yet occurred. *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 597 (7th Cir. 2017) (affirming dismissal of FMLA interference and retaliation claims where "the only admissible evidence establishes that [defendant] terminated [plaintiff's] employment on November 19," "before [defendant] knew that he had requested FMLA leave"); *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012) (affirming summary judgment on FMLA interference claim where the employee requested FMLA leave after the termination decision had already been made). And if that were not enough, it is undisputed that this selection was "based upon feedback [O'Malley] received regarding McKinzie's performance, including that McKinzie did not provide her work counts in October and moved work offshore and concerns as to whether she (McKinzie) could handle a full scope of work." Doc. 97 at D12.[4]

Given Conduent's evidence, McKinzie needed to present sufficient "countervailing evidence" that would nonetheless allow a jury to conclude that Conduent terminated her because she requested or planned on taking FMLA leave. *Searle v. Salvation Army*, No. 117CV02519,

---

[4] In her response brief, McKinzie claims that Conduent represented that McKinzie's termination was "due to being chosen for the RIF in 2022, [which was] unrelated to performance (*Defendant's Motion* at 3), and for her work performance (*Defendant's Motion* at 5)." Doc. 99 at 3. She further argues that these "conflicting reasons . . . alone create[] a genuine issue of material fact." *Id.* This is not a credible argument, however, because Conduent never states that the RIF selections were "unrelated to performance," as McKinzie claims. *Id.* (citing Doc. 96 at 3). To the contrary, it is undisputed that O'Malley selected McKinzie for the RIF based on feedback about McKinzie's work performance. Doc. 97 at D12. Conduent's statements about McKinzie's termination are entirely congruent, and the Court will not allow McKinzie to artificially manufacture an issue of material fact where one does not exist.

16

2019 WL 952710, at *7 (S.D. Ind. Feb. 27, 2019). She has not done so here. In her response brief, McKinzie simply "asserts"—without citing to any evidence—"that one of the reasons for her termination was due to exercising her rights under the FMLA." Doc. 99 at 3. But McKinzie cannot rely solely on allegations at this stage of the case, and her inability to point to any supporting evidence means that this interference theory cannot survive summary judgment. *See Kohls v. Beverly Enters. Wis., Inc*., 259 F.3d 799, 807 (7th Cir. 2001) (affirming summary judgment where defendant "asserted that [plaintiff's] deficiencies were the reason for her termination and that she would have been terminated regardless of her leave, and [plaintiff] has not presented sufficient evidence for a fact finder to conclude otherwise"); *Searle*, 2019 WL 952710, at *7 (granting summary judgment because defendant "set forth substantial evidence that [plaintiff] was not entitled to remain in her position regardless of whether she planned to take FMLA leave because it would be eliminated either way" and, "[a]lthough [plaintiff] disputes this conclusion, she offers no evidence to call into question the evidence that TSA made a budgetary decision to eliminate her position").

The Court therefore grants summary judgment to Conduent on the FMLA interference claim.

## B. FMLA Retaliation

McKinzie's second FMLA claim is based on the theory that Conduent retaliated against her for requesting FMLA leave. For an FMLA retaliation claim, McKinzie must prove that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the two. *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018).[5] Conduent does not dispute the first two elements but instead argues that McKinzie has

_____

[5] A plaintiff can also prove FMLA retaliation under an indirect method by showing that "(1) she is a member of a protected class, (2) she was meeting [the employer's] legitimate expectations, (3) she

not presented evidence to create a genuine issue of material fact with respect to the third element. The Court agrees.

McKinzie again presents two theories for this claim, first arguing that "the work of a separate full-time benefits employee, Jackie, was added to McKinzie's list of responsibilities" in April 2022. She also argues that Conduent retaliated against her for her FMLA request by terminating her. Both theories suffer from the same defect as the interference claim, namely that the adverse employment actions both occurred months before McKinzie requested FMLA leave or informed anyone of her need to take time off for medical appointments. Conduent simply could not have chosen to add additional work to McKinzie's list of responsibilities or selected her for the RIF based on McKinzie's protected FMLA activity, because that activity had not yet occurred at the time. *See Billings*, 2014 WL 5100633, at *5 ("The evidence is undisputed, however, that [plaintiff] was selected for the November 2012 RIF in August 2012—two months before she requested FMLA paperwork. Accordingly, no reasonable jury could find that the proximity between [plaintiff's] request for FMLA paperwork and her termination was anything more than a coincidence."); *DellaValle-Jones v. Xerox Corp.*, No. 120CV00288, 2022 WL 972662, at *11 (S.D. Ind. Mar. 31, 2022) (granting summary judgment on FMLA retaliation claim because "the termination decision was made prior to [plaintiff's] engagement in protected activity and thus could not have been motivated by such protected activity").

In her response, McKinzie does not even attempt to argue that Conduent added additional work to her job responsibilities because of her FMLA request. Instead, she focuses only on establishing causation for the termination theory, arguing that she has satisfied this element

suffered an adverse employment action, and (4) [the employer] treated similarly situated employees without a disability more favorably." *Billings v. B&B Elecs. Mfg. Co., Inc.*, No. 13 C 3576, 2014 WL 5100633, at *5 (N.D. Ill. Oct. 10, 2014) (citation omitted). McKinzie does not purport to prove her claim using this method, nor does she identify any similarly situated employees who received more favorable treatment. The Court therefore focuses its analysis on the direct method of proving FMLA retaliation.

"through evidence of pretext and suspicious timing." Doc. 99 at 7. Specifically, she argues that "it is highly likely that Ms. McKinzie's termination decision occurred in March of 2023, two days after Ms. McKinzie informed O'Malley that she planned to take time off due to her medical condition." *Id.* This argument is untenable because it is an undisputed fact that "O'Malley selected McKinzie for the reduction-in-force in December 2022," Doc. 97 at D12, which was before McKinzie engaged in any FMLA protected activities. None of the evidence McKinzie cites changes this undisputed fact.

For these reasons, the Court grants summary judgment to Conduent on the FMLA retaliation claim.

### III. FLSA and IMWL Misclassification Claims

Finally, Conduent moves for summary judgment on McKinzie's FLSA and IMWL claims. Starting with the FLSA, an employer must generally pay overtime wages for any hours worked in excess of 40 per week. 29 U.S.C. § 207. There is an exception, however, for individuals "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") has promulgated regulations clarifying that this exception applies to employees (1) who earn a salary of at least $684 per week; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a). These exceptions "must be given a fair, not a narrow, reading," and district courts should conduct "a thorough, fact-intensive analysis of the employee's employment duties and responsibilities" to determine whether these three criteria are satisfied. *Williams-Bell v. Brit. Standards Inst., Inc.*, 532 F. Supp. 3d 640, 646

19

(N.D. Ill. 2021) (citations omitted). The administrative exception is an affirmative defense, and thus the employer seeking to apply it to an employee bears the burden of proving that it applies. *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 507 (7th Cir. 2007).

Here, it is undisputed that McKinzie received a salary of at least $684 per week. The Court therefore must first identify McKinzie's primary duty before analyzing whether Conduent has satisfied the second two criteria. DOL regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The parties agree that McKinzie's primary duty was working on the Delta account managing qualified domestic relations orders, meaning that she would "review the order, calculate benefits, set up the payments, and manage the 401(k) payroll process." Doc. 97 at D57. They further agree that this primary duty included tasks such as assisting call center representatives with questions from Delta, meeting with Delta representatives on a biweekly basis, and peer reviewing the work of other employees on the Delta account. They disagree, however, about "the *characterization* of this primary duty." *Williams-Bell*, 532 F. Supp. 3d at 646. The question of whether this work "is administrative in nature such that the administrative exemption applies . . . is a question of law," meaning that the Court can properly consider the issue on summary judgment. *Id.*

The Court agrees that Conduent has met the second criteria because McKinzie's primary duty was the performance of non-manual work directly related to the management or general business operations of Conduent's customer, Delta. First, it is undisputed that McKinzie's work was not manual in nature. Doc. 97 at D72. While McKinzie argues that her primary duty was not directly related to Delta's management or business operations because it did not support "Delta's core function [of] flying passengers and cargo," Doc. 99 at 15, this is an unreasonably

narrow interpretation of the DOL regulations. As Conduent correctly points out in reply, the DOL regulations expressly state that "[w]ork directly related to management or general business operations includes . . . work in functional areas such as . . . personnel management; human resources; [and] employee benefits." 29 C.F.R. § 541.201(b). Because it is undisputed that McKinzie's work "directly related to Delta's employees and its employee benefits plans," Doc. 97 at D71, Conduent has established the second criteria. *See Furlong v. Johnson Controls World Servs., Inc.*, 97 F. Supp. 2d 1312, 1315 (S.D. Fla. 2000) (holding that a "senior benefits analyst" whose "primary duty was to evaluate the company's benefits plan and design changes" "clearly" performed work "directly related to the management policies or general business operations of [employer]"); *Copas v. E. Bay Mun. Util. Dist.*, 61 F. Supp. 2d 1017, 1035 (N.D. Cal. 1999) (holding that personnel analyst's "duties were directly related to the [employer's] management policies or general business operations because his primary responsibility was to execute the [employer's] retirement policies").

The Court also agrees that Conduent has met the third element because McKinzie's primary duty included the exercise of discretion and independent judgment with respect to matters of significance. The exercise of discretion and independent judgment "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e); *see also Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 873 (7th Cir. 2008) (employees who merely "grade, classify, or otherwise determine whether specified standards are met[] are not exercising discretion or independent judgment for purposes of the administrative exemption"). Additionally, the exercise of discretion and independent judgment "implies that the employee has authority to make an independent choice, free from immediate direction or supervision," but employees may satisfy

21

this criterion "even if their decisions or recommendations are reviewed at a higher level." 29

C.F.R. § 541.202(c).

McKinzie exercised discretion and independent judgment with respect to matters of

significance in multiple ways. First, she was responsible for researching and analyzing questions

raised by Delta employees. *See Copas*, 61 F. Supp. 2d at 1036 (employee exercised discretion

and independent judgment in part because he "research[ed] and analyze[d] issues" and "ma[d]e

recommendations" to help administer the employee benefits system); *Blanchar v. Standard Ins.

Co.*, 736 F.3d 753, 758 (7th Cir. 2013) (employee exercised discretion and independent judgment

when "advising sales staff[] and fielding questions"). While McKinzie argues that she did not

use her "judgment and analysis" when resolving these questions because she was bound by

formulas and guidelines set by management, Doc. 99 at 18, this argument fails. The Seventh

Circuit has expressly confirmed that an employee who is bound to work within "a highly

regimented set of rules" may still exercise independent judgment. *Kennedy v. Commonwealth

Edison Co.*, 410 F.3d 365, 374–75 (7th Cir. 2005). And in *Williams-Bell*, a case relied upon by

McKinzie, the court similarly held that an employee was not "necessarily precluded from

exercising discretion and independent judgment in her role" simply because she was "required to

work within a well-established and binding framework." 532 F.Supp.3d at 650. The court

reasoned:

> It takes no great leap to assume that most vocations (or avocations) require some sort of adherence to guidelines or rules. To throw a strike in baseball, for example, a pitcher must throw the ball from a spot at least sixty feet, six inches from home plate and must fit the pitch within an imaginary block of space above the plate. But so long as that framework is heeded, it is up to the pitcher whether to throw overhand or sidewinder, heat or off-speed, down the middle or on the corners.

22

*Id.* That is clearly the case here. Although McKinzie was limited to the framework set by Conduent, she undoubtedly exercised discretion and independent judgment *within* the confines of that framework. Her deposition testimony confirms this, because she testified that she did not need to "get approval" from anyone at Conduent before responding to Delta with answers and expressly confirmed that she "had discretion in these areas" and "would use [her] judgment in how to answer questions that came." *Id.* at 15–16; *see also id.* at 307 (again testifying that she had "discretion and judgment" "within the written guidelines").

McKinzie also exercised discretion and independent judgment during her biweekly meetings with Delta representatives, in which she answered their questions and discussed necessary enhancements or projects. It is undisputed that "[n]o one else from Conduent participated on those calls," Doc. 97 at D65, and a significant amount of discretion and independent judgment would have been required to manage this client relationship and ensure that she was meeting Delta's needs, *see, e.g.*, *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 581 (7th Cir. 2012) (pharmaceutical representatives who visited doctors "with minimal supervision" exercised a significant amount of discretion because they "must tailor their messages to respond to the circumstances, whether those be the time or attention constraints from the physician or the concerns and objections that are voiced during a particular or previous visit").

Finally, McKinzie exercised discretion and independent judgment when it came to the offshore employees staffed to the Delta account. It is undisputed that McKinzie "managed and trained offshore employees as directed by the Client Service Manager." Doc. 97 at D67. It is also undisputed that she "peer reviewed the work of individuals on the Delta project who worked offshore." Doc. 97 at D67; *see also* Doc. 97-1 at 18 (testifying that she "had to dedicate time to

23

train and then . . . to review [the offshore team's] work"). This only further supports a finding that McKinzie exercised discretion and independent judgment, as "[s]upervisory and training responsibilities are evidence of duties that are administrative in nature." *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 535–36 (7th Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).[6]

Conduent further argues that the above work involved "matters of significance," and McKinzie does not dispute this point. DOL regulations clarify that the "term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). McKinzie was the "point person" for Delta, Doc. 97 at D69, which was one of Conduent's important clients. *See* Doc. 97-1 at 191. And O'Malley testified that it was "very important" for Delta to "be happy," and that McKinzie's "role [was] to keep Delta happy." Doc. 97-1 at 191. Given this, there can be no doubt that McKinzie's exercise of discretion and independent judgment involved matters of significance. *See Verkuilen v. Mediabank, LLC*, No. 09 C 3527, 2010 WL 3003860, at *3 (N.D. Ill. July 27, 2010) ("[Plaintiff] was the primary customer contact for clients. Obviously, [defendant's] relationships with its clients are very important. Plaintiff's duty was to resolve problems the clients had in using [defendant's] software and to keep the clients happy. We continue to have no difficulty concluding that

---

[6] While McKinzie argues that this "was not a task [McKinzie] regularly undertook, and in no way can be considered a primary duty of McKinzie's," Doc. 99 at 19 n.11, the Court is not convinced. Although this was a relatively new responsibility for McKinzie, she testified that the addition of these training and review responsibilities took "a lot of time." Doc. 97-1 at 62. The fact that this was a relatively new addition to her primary duties does not undermine Conduent's affirmative defense because McKinzie exercised discretion and independent judgment in other ways prior to the addition of these responsibilities. *See, e.g.*, *Demos v. City of Indianapolis*, 126 F. Supp. 2d 548, 566 (S.D. Ind. 2000) (no "genuine issue of material facts as to the administrative nature of Demos' primary duties," even where these duties "changed slightly" over time," because "they continued to meet the requirements of the regulations governing exempt administrative employees"), *on reconsideration in part*, 139 F. Supp. 2d 1026 (S.D. Ind. 2001), *aff'd*, 302 F.3d 698 (7th Cir. 2002).

24

plaintiff exercised discretion and independent judgment with respect to matters of significance.").

Because McKinzie received a salary of not less than $684 per week, her primary duty was the performance of non-manual work directly related to the general business operations of Conduent's clients, and her primary duty included the exercise of discretion and independent judgment with respect to matters of significance, the Court holds there is no genuine issue that McKinzie was an exempt administrative employee. For this reason, her FLSA claim fails. And because a violation of the IMWL is contingent on establishing a violation under the FLSA, 820 Ill. Comp. Stat. 105/4a(2)(E), McKinzie's IMWL claim must fail as well, *Kennedy*, 410 F.3d at 376. The Court therefore grants summary judgment to Conduent on McKinzie's FLSA and IMWL claims.

## CONCLUSION

For the foregoing reasons, the Court grants Conduent's motion for summary judgment [95]. The Court enters judgment for Conduent on McKinzie's first amended complaint and terminates this case.

Dated: February 17, 2026

SARA L. ELLIS
United States District Judge

25